Our second case of the day is Mouradian's estate against Jackson County. Good afternoon, your honors. May it please the court, Attorney Nate Cade. Counsel, you will be called when the court is ready to hear you. Mr. Cade. Thank you, your honor. My apologies. May it please the court, Attorney Nate Cade, appearing on behalf of the appellant, the estate of Anthony Mouradian. Anthony Mouradian was a pretrial detainee at the time of his death by suicide, a risk that agents of the county and Dr. Ashley Hakes knew about beginning in July of 2019. His death was the logical outcome of multiple failures, provide for his medical care and protect him from self-harm. There are a couple of issues that I'd like to discuss. First, I want to talk about the professional judgment standard. I also want to get into issues regarding the county defendants. With regards to the professional judgment standard, under this court's recent pronouncements regarding application of the 14th Amendment to pretrial detainees, each and every time the subjective standard has been removed. Do you agree that we should be analyzing this then under the 14th? Yes, absolutely. Because in Lewis versus Downey, this court said that you're essentially in this purgatory of time period. And they actually cite Supreme Court precedent that said a for Eighth Amendment, you have to be not only convicted and sentenced. It was in a footnote from 1977 or 79, but that was the application in the Lewis case. So the district court applied the professional judgment standard, which contains a subjective element. And we believe it was wrong. I understand why you think that language was wrong. But I don't understand why you think the judgment was wrong. The judge elsewhere, in his opinion, made it crystal clear that he was using an objective standard. You've got one mistaken phrase, but we don't reverse judgments for one mistaken phrase. You get the problem? Judge Easterbrook, I don't think he said he looked at it under objective, but I don't think in applying it towards Ashley Hake and the professional judgment standard he did. Because, for example, he cites to our expert witness, Eugene Braxman, and said, well, no reasonable professional would find this. But the citation to the deposition transcript specifically was Dr. Braxman saying not over the course of treatment, beginning in July or August, but after he was convicted, that there should have been something different. My colleagues on the other side spend a lot of ink talking about all the stuff that Ashley Hakes did right. And we don't dispute she met with him. However, we know that there was a settlement agreement because he was a mental commitment under Chapter 51. But didn't she request that that be extended? No, she reached out to Northwest Connections and said, can it be extended on May 4? On May 7, the judge took it away. And I don't understand, Judge, in response. I don't think you understood. I said she requested. She reached out to Northwest and said, is there any way we can extend it? Had she turned around and said to Northwest, to the social worker, he's refused to meet with me on multiple times. He's not taking the drugs. So, yes, she did ask for it. It wasn't accepted. But you think she could have done more to get Northwest to say yes? I think if she had told Northwest that he's not med compliant and he didn't meet with me, he's not meeting the terms, they could have gone back to court or evaluated and made that decision. And she didn't say, I want to extend it. She said, is there any way to extend it? So she has a contract that he signed that he is not compliant with. And all she can do is raise her hand and say, from March 18, when he comes back to May 4, here's all the things that he's violated. Didn't do that. So did she not do it because she didn't know what she was doing? Did she not do it because she erred and is thinking, well, you know, he'll be done soon. I'll be rid of him because he'll be sentenced out. I don't know the answer to that. So my understanding is factually we're not contesting that she requested it. What I'm hearing you say this morning is that she didn't do enough to substantiate her reasoning. Respectfully, Judge, I don't know if she requested it. She said, can it be extended? She didn't say, I want to extend it. That's a different thing. Because if she said, I want to, the conversation in the e-mail exchange would have been, why? Well, he did this. She just said, can he? And the other thing factually, and I don't understand, Judge, because it's not in the record. We don't have access to it with regards to the materials. It was supposed to be a 90-day, but it wasn't 90-day because it's March 18. And then May 7, he's in front of a judge and it was withdrawn. That's not 90 days. So I don't quite understand the rationale for it from a timing perspective. But she clearly knew before the judge took away the commitment that she could have said, he's violated it and here's why. And maybe Northwest Connections says it's no big deal. On top of that, with regards to not being med-compliant, she relies on a nurse practitioner to say, well, she knows about it and didn't do anything. But the nurse practitioner was not part of the mental health commitment. It was Dr. Hakes and Northwest Connections. So you can't pawn off on somebody else that obligation. Getting back to the professional judgment standard, we also know, putting that aside, Dr. Hakes ignored her own opinions and concerns. For example, when he was tying a towel around looking around, she sends an email or she receives an email from the captain of the correctional staff and she says, ugh, I know he was a little upset and mentions, maybe I should reach back out to Northwest Connections, but doesn't do that or do anything with regards to that. She also knows that he's supposed to meet with her and she specifically asked for language in the commitment such that, not that he had to meet every week, he had to meet every week when she was available. So as she noted, there could be times where she is not available because of running late or she was working for the Department of Corrections for the state of Wisconsin, she may have been put aside. So she was very clear that when I'm here once a week, he is to meet with me and he declined numerous times. That goes against her own advice. Turning next to the county defendants, and I do want to mention, they know, well, we're relying on the professional judgment of Dr. Hakes. Well, the professional judgment of Dr. Hakes did not tell the two guards in particular, don't monitor the video feed, especially Mr. Johnson. The professional judgment of Dr. Hakes also did not say that, you know, county, we can change your suicide policy and you not follow it. So the suicide policy was very clear that after an inmate is sentenced, I'm sorry, convicted. Counsel, I had to go back and take a look at the email correspondence between Dr. Hake and Kennedy. And the question was asked by the psychologist, if there any way to extend this. I apologize, Judge. I'd have to pull it up, but. I have it right here in front of me. It's docket 115-3, page 70. And so that question was presented and it was Northwest who comes back and answers that question with, we are not able to extend it. We're not able to extend it, but if he violates it, it's not a question of it being extended. He's violated. He's put back. So my question was going back to my original question, I thought that was the from the record was that after that was done. And the argument being that it was unprofessional for it not to have been extended. So what you're attacking really is the lack of, I guess, the representation from the psychologist. These are the reasons why this needs to be extended. Correct. Because she's the only one in contact with Northwest Connections. They're contacting her weekly for updates. So at any point in time from March 18, when he returns, every violation, she could have said he's violated. And then even on May 4th, once she says, well, can it be extended? The next thing should be, well, but he's violated it. I mean, the contract, she negotiated that part of the contract. So it wasn't as if she didn't know or understand what was going on. Well, that conversation from the judge making the decision to dismiss the settlement agreement. Would that correspondence happened with Northwest or would it have happened with the psychologist? There was a hearing judge. And the reason I apologize is we have in Wisconsin a thing called CCAP so you can pull things up. I checked even again this morning. Anthony Meradian nowhere appears on CCAP. So there's certain things that may be hidden. We don't have direct access to in terms of how that appeared. Getting back to my point with regards to the guards and their saving professional. Nowhere in the record did Dr. Hakes tell the guards do nothing. For example, when she's alerted that he's tying the towel, she doesn't say, thanks, I've got it covered. She doesn't say, thanks, don't do anything. She just says, ugh, I'm wondering if he's having problems. So the guards have their own duty to monitor. Not only is that part of their policies, not only is that part of the 14th Amendment standards in terms of protection. The guards also have obligations to watch over him. And they didn't do it. We don't have a reason. When I deposed Mr. Johnson and said, what were you doing? His response is, I don't know. I can tell you probably everyone on that panel knows where significant things happen in your life. 9-11, you could probably remember exactly where you were. The birth of children, marriage, you can remember certain facts. The first suicide in a jail in 10-plus years and you're on watch? I think I'm going to remember if I'm checking email, reading a book, talking about the brewers, or something else. But to say, I don't know, he did nothing. And he has the monitor. It's right there. And you literally watch on video an inmate kill himself. What were the standards in place, I guess, at the time from, I think it's around May 21st, when Dr. Higgs makes the representation, I will connect back on May 28th? Are there any, I don't want to say warnings, or from the medical side in regards to watching? No. Those have all been lifted? Those have all been lifted. And she continually had said, well, he's doing better than he did before he went away. But he was still reporting either a 3 out of a 10, a 4 out of a 10, and beforehand he was 3.5. So whether it's a 3.5 out of 10 to a 4, that's marginal. But she had noted several times, he still has suicidal ideations. And once you have someone, we have to remember that in February, he was supposed to have his original conviction. And his attorney reached out to the court and said, he told me this. Now, there is a question of whether he truly said he was trying to hang himself, whether you believe the attorney or not, or just tying knots. But Dr. Hakes knew that prior to sentencing, he was starting to decompress. She did nothing prior to his conviction in April, and she did nothing afterward, not even a modified restrictive. More checks, special monitoring on the video camera. They have four video feeds on these cameras, and they can set them up. One of them is for the courthouse. You know, no one's in the courthouse at night. So as they noted, they could have easily had on this 32-inch screen one big blowup of Anthony Morady. Was there evidence presented from a professional that there was more that she was supposed to do? Dr. Braxma mentioned that he does say in his deposition that after he was convicted, there should have been this heightened concern. Because that's when, you know, you have suicides occur usually in the first week someone is there, and then usually when you're in a county setting, usually right before you are sentenced. So he did note there should have been this heightened standard. She should have done something else. She could have put him on some sort of modified. She never raised a concern, reached out, said, hey, he just got convicted. Keep an eye on him. Nothing. And I think I'm in my rebuttal time, so I'll save what little time I have. Thank you. Certainly, Mr. Cade. Mr. Sibby. Thank you, Your Honors. May it please the Court, I represent Dr. Ashley Hakes. What I heard a lot from counsel was about what could have been done, ideas that maybe something could have been done in 20-20 hindsight. And that's not the standard for a 1983 claim here, even under the 14th Amendment. The question is whether the estate can prove that my client, Dr. Hakes, acted in an objectively unreasonable manner. And that's what they cannot prove. The case law shows that in order to show that, the estate has to prove that no minimally competent mental health provider would have acted the way that she did. And the record does not support a finding of that. The district court relied primarily on Dr. Broxema's own testimony, the plaintiff's own expert. I heard that Dr. Broxema testified she should have done more. What Dr. Broxema testified is he thought, had he been in that position, he would have made different decisions. It's easy to say that in 20-20 hindsight. But he was unwilling, unable to testify at his deposition that any standard required her to do more. He conceded that other reasonable psychologists would have done the same thing that she did. And when asked point blank by plaintiff's attorney during the deposition, would you say no minimally competent psychologist would have done what she did, he refused to do that. We can talk about what could have been done, what other psychologists may have done. We can talk about history. What was the case in November of 2019, December of 2019, January of 2020. But that's not the focus, that's not the standard here. With a psychologist such as Dr. Broxema. Can I ask though, does the professional judgment standard survive Pittman or Miranda? I believe it does. It's not whether my client had a subjective awareness of a significant risk and disregarded it. Rather we look at and give deference to what was her decision making, what was her judgment call at the time. And was it objectively unreasonable. And so it goes down to whether a minimally competent psychologist would have made the same decisions. Some things to address with regards to the commitment. I mean my client worked with Mr. Meridian for over a year. She met with him weekly. She met with him more than any other inmate. She worked with him very closely. She tried over a year or about a year to help him in any way that she could. When she found that he had a heightened risk of suicide, she placed him on suicide watch. She contacted Northwest Connections and had him under emergency detention. Could she have extended it? No, it's not her decision. So Northwest Connections is the one that has contracted with the county in order to petition the court for those detentions. And so she reached out to them and said, I think he's deteriorating. I think he needs to be transferred to Sacred Heart and then Winnebago. And she was communicating with them about what her opinions were at that time. We're talking about February of 2020. And then when his commitment was ending, she reached out to him. Can this be extended? And they said, no, it could not. When he returned then, she continued to meet with him weekly. She continued to assess him. He refused a few of those after the settlement agreement was over. He did once on May 13th. The settlement agreement had already been dismissed on May 7th. There were no violations of the settlement agreement. The repeated representation by the estate that he wasn't med-compliant is not supported by the record. We addressed that in our brief. He came back. He was reporting symptoms and side effects with one of the medications. My client reached out to the nurse practitioner and said, hey, he's reporting this. Can you meet with him? The nurse practitioner met with him. She agreed to discontinue that medication. My client, as a psychologist, can't prescribe medication. At any time when he reported complaints, she would refer back to the nurse practitioner. Can you please reassess his medication? And that was over the course of the entire year that he was there. Under 1983, my client can't be held responsible for what Northwest Connections did, what the nurse practitioners did, what others did. We look at what her conduct was. I believe that the estate needs an expert to show to a jury that no minimally competent psychologist under these circumstances, based on what was known to my client at the time, would not have made the same decisions. Not only does the estate not have an expert, they have a psychology expert who wasn't willing to say those things. I do think the district court got it right that whether you're analyzing this under the Eighth Amendment or the Fourteenth Amendment, an objective standard must be met. It's not an election that must be made by the district court. Rather, there's an objective element that the estate cannot meet here. The argument that my client ignored her own opinions really ignores the fact that this is an ongoing assessment. Week to week, she's meeting with Mr. Moradian and assessing him. She's talking about whether he's med-compliant, whether he's eating and drinking, whether he's having any plan or intent for suicide, any suicidal ideation. And her opinion in February is not the same as March or April or May. I think that that's actually a very important part of the assessment because you can't put every inmate on a suicide watch who's waiting to be sentenced. You can't have an inmate be on suicide watch for an entire year if he doesn't deserve to be there. The question is, in May of 2020, when she's meeting with him, when she's assessing him, is that her professional judgment and determination, does he need to be on suicide watch? And her determination was no. And she was communicating that, one, in documenting it in her soap notes, and two, with her weekly emails to the jail staff. The record is very clear as to the last time she met with him was approximately a week before his suicide. During that time, he was eating, he was drinking, he was taking his medication. She had gotten him a job in the laundry room. He was future oriented. His mood was improved. He was doing better. She documented that and she communicated that to jail staff. And so I don't believe that the estate can meet the objective prong of its 1983 claim. Thank you. Thank you, Counsel. Ms. Mills. Good morning, Your Honors. May it please the Court. Mr. Meridian was at Jackson County Jail for quite a while, as far as pretrial detainees go. And he did have a lot of ups and downs in that time, a lot of mental health issues. But case law doesn't really tell us how far back we must look when we're talking about a suicide risk. But a key fact in this timeline of months and months of ups and downs really needs to be emphasized that between March 2020, when he was returned to the jail from Winnebago Mental Health Institute, where he had been stabilized and was ostensibly in essentially the best condition he had been in since he had come to the jail in July 2019, in the six weeks between then and when he hung himself, he never made a single threat of suicide or made a suicidal statement to any correctional officer. What was the purpose then of Sergeant Rich's email on April 14th? I think it was an abundance of caution. She was aware that he had gone to Winnebago. Everybody kind of knows when somebody goes there, it's a serious situation when you have to go under Chapter 51. And she, to her credit, she didn't hear him saying something that suggested he was suicidal and she didn't see him tying something around his neck, but she saw him looking around in a way that made her concerned. And so she put her subordinates on notice during third shift, hey, just keep an eye out because the way he was acting, it could have been interpreted as someone looking around for somewhere to tie something. I just don't want to minimize that fact. Absolutely not. Nothing put anyone on notice between March and May when we have a sergeant who has identified, there's some concerning, be watchful. Sure. And I think that what she saw him do could be categorized as the type of odd behavior that we know from, for instance, the Wal-Mart case. That alone is not enough to put correctional staff on notice of a suicide risk. But she noticed it, made a note to her colleagues anyway, and they kept an eye on it. Now that happened in April, April 14th, an additional month and a half goes by before he commits suicide. So even using that date to look backwards and say, well, what were correctional staff aware of? That was the last bit of behavior of any kind that anybody saw, and it really wasn't necessarily a direct arrow towards this gentleman is suicidal. Instead it was, well, I know he's got history. I'm a little concerned, so out of an abundance of caution, I'm going to let everybody know, just keep an eye on him. And so I think she certainly was not acting in an objectively unreasonable manner. Then in the next six weeks when nothing happens, he doesn't say anything suggesting that he's suicidal. He doesn't take actions beyond simply looking around his cell. For instance, there are no suggestions that he actually was caught tying something to bars. So in those six weeks, nothing happens that would make officers think, we need to take an even further step and put him on any kind of heightened watch status. Also, I think it was said in some of the arguments in the briefing, but the correctional staff has never contended that we can't be liable just because we were deferring to the decisions of a medical professional. We could take Dr. Hikes out of the equation entirely and ignore all of the emails she was sending to jail staff throughout April and May saying, he's doing great, I think this laundry job is really going to help him. We could ignore all that and we would still have an empty record of six weeks of behavior not showing any risk of suicide. But in addition to that lack of statement or behavior suggesting suicide, we have this trained medical professional who's seeing him regularly and is reporting to jail administrators he's doing well. And her last visit a week before he committed suicide was a very productive meeting. I think this is some of the best I've seen him. I'm going to see him in another week. And in that week between her last visit and his suicide, again, nothing happens that would put any of the officers on notice that this gentleman is going to be a risk, other than if we look all the way back and say, well, he was on suicide watch once. He was sent to Winnebago once. But as a matter of law, that's not enough. Six weeks, two months, three months later to impute into jail staff this knowledge that he is just this continuing suicide risk and must be on suicide watch endlessly. Jails simply cannot keep inmates on suicide watch for that amount of time, especially when they deny suicide ideality and they have been examined by medical professionals who say there's no current suicidal risk. Another thing I did want to point out, just very briefly, is that even if there is some concern that perhaps there was some indication or staff could have maybe taken a different, more proactive role, these officers would certainly be entitled to qualified immunity. Under the case law, they are entitled to defer to the trained medical professionals in the correctional setting. They would have had no reason to think that he was not, Mr. Murray, was not receiving treatment or that Dr. Hawks was not providing adequate treatment. They knew he was seeing not only Dr. Hawks weekly, but that he was receiving medication from the advanced practice nurse practitioner. So this isn't a situation, some of the cases where you see an inmate is simply being ignored by medical staff and correctional staff becomes aware of it. This is a case where they knew he was actively treating with medical staff. All they're hearing is that he's doing great from trained medical professionals, and all they're actually seeing with their own eyes and observing is that he's doing fine, he's doing better, he seems more upbeat. And so even if there is some question, we've raised the defense of qualified immunity. Plaintiff did not raise that in his brief, did not mention it in its reply, and so on that basis as well, we believe that the correctional staff is certainly entitled to the summary judgment that the district court entered. Finally, on the Monell arguments, they essentially are non-starters. Even if we assume that there was an issue with radio communications, even if we assume that there was some confusion about suicide watch policies, which the record truly does not contain evidence of those claims, but even if we assume that, there is simply no evidence to suggest that Mr. Muradyan's suicide was a result of some confusion about suicide watch policies, that somebody didn't put him on suicide watch because they just didn't know what the policy said. There's no indication that his suicide had anything to do with radios not working in the facility, and in fact the record shows that the radios did communicate on the night in question. And so on that basis, the record as it stands in the case law, we would request that this court affirm the district court's grant of summary judgment in favor of the county defense. Thank you, counsel. Thank you. Anything further, Mr. Cade? Yes, Your Honor. A few points that my colleagues raised and which you touched on. First, with regards to counsel saying, citing minimally competent, that's a subjective standard. That's going back to professional judgment. That doesn't deal with the object of nature. Second, there are, at least in the record, there are e-mails. For example, May 4th, Dr. Hake's e-mails, the person at Northwest said, Muradyan had a setback with his plea hearing, and then she expects it's going to get worse as of July 20th. She copies the captain of the guard, Bo, in that e-mail, and she notes by setback, she means a similar issue coming up before his July 2nd, 2020 sentencing. My colleague mentions with regards, you can't keep someone on suicide watch. We weren't saying that he had to be in a smock, but they definitely had a modified suicide watch. They could have done that. They could have, at a minimum, said, we're going to blow up the cameras at night and have a 32-inch monitor look at his cell of the four and monitor it. They didn't do that. And finally, with regards to Monell, there was nothing about the suicide watch because none of the guards were trained on what they had to do. As I noted, their policies specifically note that if an inmate is about to be sentenced or convicted, convicted and they are about to be sentenced, I apologize, you are to monitor them. They did none of that. So for those reasons, I believe the district court should be reversed. Thank you. Thank you very much. The case is taken under advisement.